UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARK CORNISH, individually and f/u/b/o
ST. PAUL FIRE & MARINE INS. CO.,

          Plaintiffs,

vs.                                      Case No.: 8:06-CV-1722-T-27EAJ

RENAISSANCE HOTEL OPERATING
COMPANY, WSRH VSP, L.P., and
THE VINOY CLUB, L.C.,

          Defendants.
_____/

## ORDER

**BEFORE THE COURT** is Defendants' Motion for Final Summary Judgment (Dkt. 28), to which Plaintiffs have responded in opposition (Dkt. 48). Upon consideration, Defendants' motion is DENIED.

### *Background*

Plaintiff Mark Cornish ("Cornish") was the owner of a 61-foot Hatteras motor yacht named "WWW.STPETE.COM" ("the vessel"). (Compl. ¶ 7). Plaintiff St. Paul Fire and Marine Insurance Co. was the insurer of the vessel. (Compl. ¶ 8). During the relevant period, the vessel was docked at the Renaissance Vinoy Resort & Golf Club ("the Vinoy") in St. Petersburg, Florida (Compl. ¶ 9), which is owned and managed by the Defendants (Dkt. 24). In this action, Plaintiffs allege that Defendants were negligent and breached an oral contract by failing to prevent damage to the vessel during the passing of Hurricane Dennis in July 2005, which exerted "minimal tropical force winds"

1

at the Vinoy.[1] (Comp. ¶ 11). The vessel came loose from its mooring, sank, and was declared a constructive total loss. (Compl. ¶¶ 14-15). In short, Plaintiffs contend that the floating dock system and cleats to which the vessel was tied during the storm were inadequate. Defendants contend that Plaintiffs have no evidence to support this theory, and that the lines securing the vessel were insufficient. As set forth below, the record is rife with material, disputed issues of fact regarding the cause of the damage to the vessel.

During the storm's passing between July 8, 2005 and July 10, 2005, the vessel was docked in the Vinoy marina at A-dock, Slip 2. (Reynolds Dep. at 14; Dkt. 28, Exh. A). A-dock comprised the easternmost of the four parallel docks at the marina, each of which ran north to south. (Exh. A, Dkt. 39-3 at 40). The south end, or bottom, of A-Dock was divided into three prongs. (*Id.*) Slip 2 was located on the west side of the center prong. (*Id.*)

Sometime during the first half of 2005, Q-Dock Atlantic, which is not a party to this action, replaced portions of A-dock, including the entire center prong where Slip 2 was located. (Caldwell Dep. at 11, 17, 23, 27). Terry Caldwell, the owner of Q-Dock Atlantic, testified that there was "obvious structural faults to it that needed to be fixed up." (Caldwell Dep. at 22). As part of the replacement, several new cleats were anchored to the concrete portion of the floating dock with lag screws and epoxy. (Caldwell Dep. at 34). Although the standard design specifications from the original builder of the docks, Florida Floats, required 15-inch "S" cleats, Caldwell used 12-inch "S" cleats. (Caldwell Dep. at 120; Dkt. 48, Exh. 4).

There is evidence that certain cleats on the center prong of A-dock failed during the storm.

---

[1] As evidence of the wind speeds, the parties have cited only to the deposition of one of the witnesses, who estimated that the winds on July 9, 2005 were approximately 20-30 knots with gusts up to 40 knots. (Krul Dep. at 50).

Cornish saw a cleat break on the center prong, near the bow. (Pl. Dep. at 92, Exh. D-1-C). Michael Dowling, the former director of loss prevention at the Vinoy, also testified that at least one, possibly two, cleats on A-dock broke "completely broke off." (Dowling Dep. at 44-46). Although he originally testified the broken cleats were on the center prong, he could not testify with certainty as to this fact. (*Id.*) William Krul, who looked after the vessel and performed routine maintenance, testified that when he arrived on July 9th, a "spring cleat" on the center prong was broken. (Krul Dep. at 4, 35-36, 41-43, Exh. D-1-K). Krul moved the one or two lines that were on that cleat to another cleat. (Krul Dep. at 37). When he returned later in the day, Krul believed that another cleat had broken on the center prong, midship. (Krul Dep. at 54-55, Exh. D-1-K). David Weaver, who previously held a captain's license and was called to help secure the vessel, testified that " I believe [the vessel] pulled a spring line cleat off the dock. There were several cleats missing at the point off the docks, which made it a little more difficult to formulate a plan on how to secure the vessel." (Weaver Dep. at 12, 14-15, 19, Exh. D-1-W). He specifically recalled that one cleat was broken and one cleat was loose. (Weaver Dep. at 23, Exh. D-1-W). By contrast, Defendants' witnesses testified that the cleats were in good condition during the storm (Williams Dep. at 66), and they were not aware of any having broken (Kornack Dep. at 82).

Defendants argue that the number, size, condition, and location of the lines securing the vessel were inadequate. Jackson Reynolds, a dockhand at the Vinoy, testified that Cornish typically used 3/4 lines, some of which were frayed, and which he believed were not heavy enough to secure the vessel. (Reynolds Dep. at 5, 13). Rix Harden, the dock supervisor until May 30, 2005, also testified that the 3/4 inch lines were not big enough given the size of the vessel, that the lines would break, and that the Vinoy took care of the lines because Cornish "didn't particularly take care of his

lines." (Harden Dep. at 3-4, 46-47). However, he also testified that his experience with Cornish was what he would expect of any other boat owner. (Harden Dep. at 11). In June 2005, Howard Kornack, the new dock master, repaired one of the lines to the vessel, which had chafed and separated, by tying it back together. (Kornack Dep. at 63). He informed Cornish of this and later reminded him that the line had not been replaced. (Kornack Dep. at 63).

Regis Williams, a loss prevention officer and part-time marina dockhand, testified that when he first arrived on July 9th there were approximately three lines from the vessel, one at the bow, one at the stern, and a spring line from the middle of the port side. (Williams Dep. at 4-5, 32-33). Williams added a line to the vessel when the spring line snapped. (Williams Dep. at 37). Later that morning, Williams observed the lines at the stern and bow chafing. (Williams Dep. at 49). He tied an additional line at the stern, but did not tie an additional line at the bow, due to concern for his safety. (Williams Dep. at 49-50). Kornack, the dock master, testified that the line he had previously knotted broke during the storm. (Kornack Dep. at 64). He testified that he and Williams retied this line and "a couple of other ones. And we put double lines where we could." (Kornack Dep. at 68). Kornack testified there were at least six lines on the boat when he left, two on the bow, two on the stern, and two spring lines. (Kornack Dep. at 83). Kornack testified he was concerned because Cornish's lines were undersized and because the vessel was broadside to the easterly winds. (Kornack Dep. at 84-85).

Krul, who maintained the vessel for Cornish, testified that when he arrived on July 9th, there were eight lines securing the vessel. (Krul Dep. at 34). Krul testified he doubled the lines on the vessel, including one of which he tied together, and that the lines were not frayed. (Krul Dep. at 44). He testified that the boat was secure when he left. (Krul Dep. at 47). When he returned later in the

day, no further lines had snapped, and he assisted in adding additional lines to the starboard side as well as a chain and rope from the vessel to the pilings on the center prong and the stern. (Krul Dep. at 42, 48, 52, 54; Cornish Dep. at 92).[2] Krul testified that the vessel was secured when he left that evening. (Krul Dep. at 57).

Weaver testified that when he arrived the lines were not frayed. (Weaver Dep. at 28). When he left that evening, he testified there were probably ten lines securing the vessel. (Weaver Dep. at 29). Similarly, Hilton Hammond, who had captained the vessel on occasion, testified that there were six to eight lines when he arrived on July 9th. (Hammond Dep. at 13-14, 21, 25). He and his son used a 200 or 250 foot spool of 7/8 line to tie the vessel with additional lines so that "it looked like a spider web was holding the boat in place." (Hammond Dep. at 22-24). Cornish went to the vessel again at some point and left feeling that the boat was secured tied to the dock "as best as it could have been." (Pl. Dep. at 99, 103).

Williams testified that when he returned at approximately 7:00a.m. on July 10th, there had been substantial deterioration of the docks. (Williams Dep. at 61). Krul testified that the floating docks were coming apart and were "tattered, completely crumbled." (Krul Dep. at 57, 67). Dowling testified that the walkways on A-Dock were loose (Dowling Dep. at 59-60), and that after the storm "a lot of boxes were gone. A lot of the docks were broken apart; a lot of docks were upside down." (Dowling Dep. at 67). Williams testified that the bow line to the vessel had snapped, and the stern and spring lines were chafed. (Williams Dep. at 66). Caldwell also testified that the bow line had snapped. (Caldwell Dep. at 61-62). Because the docks were separating, Williams testified they did

---

[2] Weaver and Hilton Hammond testified that Krul tied a rope directly to the pilings, which is not recommended because of the potential for chafing. (Weaver Dep. at 28-29; Hammond Dep. at 34).

not do anything more for the vessel. (Williams Dep. at 67-68). The vessel had scrapings on the starboard side, the ladder on the stern was almost completely detached, and the boat was hitting Slip 4.[3] (Williams Dep. at 72, 74). Kornack observed the vessel break loose, hit Slip 4, sever the joint of the dock at the corner, and push a piling over. (Kornack Dep. at 77).

When Krul arrived on July 10th, the vessel had broken free. (Krul Dep. at 62). He boarded the vessel and navigated it to the Salt Creek Marina, approximately one mile away, where it ultimately sank. (Krul Dep. at 65, 69).

*Expert Testimony*

Plaintiffs' expert, Robert Samara, opined that "the cleats were the weak link in the whole system." (Samara Dep. at 16). According to Samara's expert summary, the maximum load for 12-inch cleats was 845 pounds, assuming a line pulling at 45 degrees. (Dkt. 48, Exh. 6 at 1). He testified that the 61-foot vessel exerted 1,213 pounds in 34 mile an hour winds. (Samara Dep. at 80). Assuming that at least 5/8 inch lines were used, the smallest line reported by witnesses, he determined that the strength of the lines was "greater than the capacity of the cleats." (Samara Aff. ¶ 5). Defendants' expert, Stephen Loporcaro, agreed that if properly tied, 5/8 line were used, the cleat would fail before the line broke. (Loporcaro Dep. at 105). Based on photographs, he testified that two of the cleats were broken. (Loporcaro Dep. at 80). He opined that "it was a combination of the cleats and lines that allowed the vessel to break loose." (Loporcaro Dep. at 79).

Samara also opined that the floating docks are not suitable for the harbor conditions found at the Vinoy marina, which has no protection from heavy, direct easterly winds. (Samara Dep. at 124-25). In February 1990, the engineers for the original design warned that winds from the east

---

[3] Slip 4 was parallel, and to the west, of Slip 2.

could create waves "great than one foot high" and specified that "[w]e are designing the marina for a one foot wave only at the Owner's specific direction and their assurance that they are assuming all risk and responsibility for damage to the marina due to waves great than one foot high." (Dkt. 48, Exh. 2). Plaintiffs note that during the storm, Weaver observed four foot waves and Krul observed three to five foot waves. (Weaver Dep. at 14; Krul Dep. at 67). In addition, the Maintenance Guidelines for the marina provided that the floating docks are "intended for protected installations such as exist behind a permanent, fixed wave attenuator or floating wave attenuator." (Dkt. 48, Exh. 3 at 3). Defendants' expert testified that the marina probably should have had a wave attenuating system, and that the design of the marina contributed to the damage to the vessel. (Loporcaro Dep. at 70-71, 103).

## *Standard*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a

genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

## *Discussion*

### A. *Negligence*

In Count I, Plaintiffs allege that Defendants were negligent in maintaining and designing the dock system, including the cleats, and that they negligently failed to warn Plaintiffs of known problems. "[A]though admiralty is a separate body of substantive and procedural law, distinct from common law," *Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. De Navegacion*, 773 F.2d 1528, 1535 (11th Cir. 1985), admiralty incorporates the general law of torts when not inconsistent with admiralty principles, *Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, 977 (5th Cir. 1978).[4] In order "[t]o establish a wharfinger's liability for the sinking of a vessel at the wharf the vessel owner must make out a case of negligence against the wharfinger." *United*

---

[4] The Court notes that the tort and contract claims in this case both fall within admiralty subject matter jurisdiction, as determined pursuant to the respective "locality" and "subject matter" tests. *See also Inbesa Am., Inc. v. M/V Anglia*, 134 F.3d 1035, 1038 (11th Cir. 1998) (contracts for wharfage or dockage fall within admiralty jurisdiction); *Sisson v. Ruby*, 497 U.S. 358, 367 (1990) (tort claim based on "storing and maintaining a vessel at a marina on a navigable waterway is substantially related to traditional maritime activity" and is therefore within subject matter jurisdiction).

8

*States v. Mowbray's Floating Equip. Exch., Inc.*, 601 F.2d 645, 646 (2d Cir. 1979). Accordingly, the Court first determines the nature of the duty owed by Defendants to Cornish, and whether they breached that duty.

*1. Duty and Breach*

A wharfinger is not the guarantor of the safety of a vessel, but owes a duty "to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel. This includes the duty to ascertain the condition of the berth, to make it safe or warn the ship of any hidden hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and not reasonably known to the shipowner." *Trade Banner Line, Inc. v. Caribbean S.S. Co., S.A.*, 521 F.2d 229, 230 (5th Cir. 1975); *Old Park Inv., Inc. v. The Vessel "LEDA"*, 469 F. Supp. 2d 1201, 1209 (S.D. Fla. 2006); *see also* 8 Benedict on Admiralty §§ 19.02[A][3], 19.04[A] (7th ed. 2006). However, "no warning is required where the alleged obstruction or condition is open and obvious to those in charge of the vessel's management or where those in control of the vessel have actual knowledge." *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977) (internal quotations omitted). Defendants have not argued that the cleats and floating docks were open and obvious dangers.

There is ample evidence in the record that the susceptibility of the docks to waves greater than one foot was known to Defendants, given that the original engineers warned of this problem. Plaintiffs also note that the marina previously sustained damage from easterly winds. Harden testified that it was widely known that easterly storms were "the worst" and that in 2003 and 2004 they had Q Dock Atlantic repair storm damage to the docks. (Harden Dep. at 22-23). Reynolds testified that the docks had come apart in other storms. (Reynolds Dep. at 24). Accordingly, there

is record evidence that damage to the docks in minimal tropical force winds was foreseeable, imposing on Defendants a duty to provide an adequate docking structure.

Plaintiffs claim that this duty was breached because the floating dock was not adequately protected, given its exposure to east winds and lack of a wave attenuating system. Dowling testified that the walkways on A-Dock were loose, and that after the storm "a lot of boxes were gone. A lot of the docks were broken apart; a lot of docks were upside down." (Dowling Dep. at 67). Krul, Williams, and Cornish testified that the docks came apart during the storm. Krul testified that "the concrete had been busted up. You had to literally jump to -- I mean it was dangerous, very dangerous." (Krul Dep. at 57). The Court finds this evidence is sufficient to demonstrate a breach of Defendants' duty to provide an adequate floating dock.

As to the cleats, there is authority for the proposition that Defendants were under a duty to provide fittings which would not fail, even in a severe storm. *Id.* at 231 (citing *City Compress & Warehouse Co. v. United States*, 190 F.2d 699, 701-02 (4th Cir. 1951);[5] *Medomsley Steam Shipping Co. v. Elizabeth River Terminals, Inc.*, 354 F.2d 476, 479 (4th Cir. 1966) (imposing duty where defective cleats failed in hurricane force winds)). However, this duty is not absolute. In *Trade Banner Line, Inc.*, the Fifth Circuit found there was no duty to "provide fittings from which ropes will not slip loose in a 138-mile per hour hurricane, especially when, as the court found, '. . . the lines could have been, at least some of them, more securely fastened than they were.'" *Trade Banner Line, Inc.*, 521 F.2d at 231. This case is easily distinguishable given that Defendants' cleats did fail, whereas in *Trade Banner Line, Inc.*, "each fitting utilized held through the storm." *Id.* at 230.

---

[5] *City Compress & Warehouse Co. v. United States* is arguably distinguishable, as the court applied the inference of negligence available when a mooring fails under normal weather conditions. Plaintiffs have not argued that the inference should be applied to the facts of this case.

Moreover, in the instant case, the winds were not severe or unusual.[6] Accordingly, the Court finds that Defendants were under a duty to provide cleats sufficient to hold the 61-foot vessel in the minimal tropical force winds.

Plaintiffs have produced adequate evidence that Defendants breached this duty. Plaintiffs' expert testified that the load of the 61-foot vessel exceeded the maximum load of the 12-inch cleats. Specifically, Samara testified that the maximum load for cleats was 845 pounds, but that in 34 mile an hour winds, the vessel exerted 1,213 pounds of force. Samara also avers that the strengths of even the smallest line used, 5/8 line, was "greater than the capacity of the cleats." (Samara Aff. ¶ 5). Defendants' expert agreed that if properly tied, 5/8 line were used, the cleat would fail before the line broke. (Loporcaro Dep. at 105). There is also evidence that Caldwell did not install the size of cleats required by the design, which called for 15-inch, rather than 12-inch cleats, and Plaintiffs' expert testified that different sized cleats have different load capacity. (Samara Dep. at 113).[7] Given that A-dock, Slip 2 was designed for a 65 foot vessel (Dkt. 28, Exh. A), this is evidence that Defendants breached their duty of care by installing 12-inch cleats.

---

[6] Defendants have not argued that the storm was an efficient intervening cause, *Gibson v. Avis Rent-A-Car Sys., Inc.*, 386 So.2d 520, 522 (Fla.1980) (noting that defendant may still be liable if intervening cause was foreseeable and in scope of danger), or that the storm an "Act of God," which "applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them," *Warrior & Gulf Navigation Co. v. United States*, 864 F.2d 1550, 1553 (11th Cir. 1989); *Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919, 925-26 (11th Cir. 2001) (finding that *vis major*, or Act of God, exception to *Louisiana* rule did not apply where winds were between 85 and 103.5 miles per hour).

[7] The Court notes that the experts did not specifically state that a 15-inch cleat would have provided the additional strength to withstand the force of the vessel. *Cf. Medomsley Steam Shipping Co.*, 354 F.2d at 478 (six-bolt cleat called for in original drawings would have provided three times as much bearing surface than two-bolt cleat actually used). At this juncture, however, Plaintiffs have adequately created an issue of fact as to whether Defendants breached their duty of care by installing 12-inch cleats.

The Court also notes that although Samara's calculations assumed "2 ½" bolts drilled and epoxied 3.5" minimum into the concrete," the experts did not address whether the cleats were properly affixed to the docks.

2.  *Proximate Cause*

In order to constitute the proximate cause of Plaintiffs' injury, the Defendants' breach must be "a substantial factor in bringing about the harm." *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978). Federal courts sitting in admiralty jurisdiction may also draw guidance from "state law applying proximate causation requirements and from treatises and other scholarly sources." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 839 (1996). Similar to federal common law, Florida courts require "evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result." *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984) (quoting Prosser, *Law of Torts* § 41 (4th ed. 1971)). "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Id.*

In their motion for summary judgment, Defendants contend that Plaintiffs have produced no evidence supporting their theory that the failure of the cleats caused the incident. The Court disagrees. According to Plaintiffs' evidence, at least two cleats broke off the center prong of A-dock. Cornish, Krul, and Weaver were consistent in testifying that the broken cleats were both on the center prong on A-dock, at the port side of the vessel. This version of the facts is buttressed by the evidence, discussed above, that the vessel exerted more force than the 12-inch cleats were capable of handling.

Defendants argue that the lines on the broken cleats were retied to other cleats or to pilings, and that there is no evidence that any other cleats failed after the lines were retied. As a result, Defendants urge that Plaintiffs cannot, as a matter of law, show that failure of the cleats caused the

12

vessel to separate from the dock. Although Defendants are correct in noting that there is no evidence that additional cleats failed after the lines were retied,[8] the Court does not find this fatal to Plaintiff's ability to establish proximate cause. First, it is not clear from the record how many cleats were available on the center prong for the vessel to be retied.[9] Caldwell "guessed" that there were six cleats on the center prong. (Caldwell Dep. at 32-33, 122). The original design specifications stated that the standard cleat layout included four cleats per slip. (Dkt. 48, Exh. 4). At the very least, it may be inferred that there were at least two fewer cleats available than the number called for by the design. As a direct result, the entire weight of the vessel was distributed amongst fewer points on the port side.[10] Second, Weaver and Kornack testified that the winds were coming from the east, broadside to the port side of the vessel. Based on these facts, a reasonable factfinder could determine that the two broken cleats, which were on the same side of the vessel exposed to the strong easterly winds, placed an increased stress on the remaining lines.

Indeed, both Caldwell and Williams testified that the bow line to the vessel did eventually snap on the morning of July 10th. Weaver and Hammond reported that Krul used rope to tie the bow to the piling, which was not proper because of the potential for abrasion or chafing. Further, even

---

[8] Samara testified several times that his evidence that the cleats failed during the storm was based on his belief that Krul testified that approximately three cleats were hanging loose from the vessel after the storm. (Samara Dep. at 81, 83, 93-95, 97). Defendants correctly note that Krul did not testify that he saw any such thing. Rather, he testified that he did not recall whether there were lines hanging from the vessel. (Krul Dep. at 68). Samara also stated in his expert summary that "both tongues of various cleats were broken off as shown in photographs." (Dkt. 48, Exh. 6 at 1). During his deposition, he was unable to identify these "various" cleats in the photographs provided, and he testified that the term "various" was in reference to Krul's supposed testimony about three cleats. (Samara Dep. at 93-94, 96)

[9] The witnesses' drawings vary greatly in depicting the points at which the vessel was tied, and it is not clear whether they depict the line arrangement before or after the cleats broke. (*See e.g.*, Cornish Dep., Exh. D-1-C; Weaver Dep., Exh. D-1-W; Krul Dep., Exh. D-1-K).

[10] Defendants' expert testified that after the two cleats broke, there would be increased tension on the remaining lines. (Loporcaro Dep. at 95-96; *see also* Samara Dep. at 90).

though Plaintiffs' expert found that the line strength generally exceeded the strength of the cleat, he suggested that a line could have broken if there was:

> a weakened section in that line, either frayed or cut or just old, deteriorated for it to break loose under maybe a little whipping effect of the wave action. When that happens, then the existing lines would have to try to pick up the additional capacity; but depending on where that line broke, *if the line broke at the bow*, then the bow is going to swing around and pose different stresses on other parts of the tethering, mooring. (Samara Dep. at 90) (emphasis added).

The Court notes that there is a factual dispute as to whether Krul used a rope by itself, as Weaver and Hammond recalled, or a chain with a rope, as Krul and Cornish testified. In addition, it could be argued that Krul tied to the piling because the cleat at the bow was broken. (Cornish Dep. at 91). As result, there is an issue of fact as to whether the breaking of the bow line was attributable to Plaintiffs, and if so, whether it was a substantial factor in bringing about the harm. *See also Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979) (noting that "[w]here two or more actors combine to contribute to the collision, each need not be the sole cause, but only a substantial and material factor in causing the collision").

"The issue of proximate cause is generally a question of fact concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *Goldberg v. Fla. Power & Light Co.*, 899 So. 2d 1105, 1116 (Fla. 2005) (internal quotations omitted). Based on a thorough review of the record evidence, the Court finds that Plaintiffs have identified material, disputed issues of fact as to the cause of the incident sufficient to create a question as to whether the failure of the cleats were a substantial factor of the damage to the vessel.[11] Defendants' motion for summary judgment as to Count II is accordingly denied.

---

[11] The Court notes that there is a lack of evidence indicating that the breakage of the dock, by itself, caused the incident. Specifically, the parties have cited no record evidence that the portions of the dock to which the vessel

### B.  *Breach of Oral Contract*

In Count II, Plaintiffs allege that Defendants breached an oral contract by failing to provide an adequate dock facility. Specifically, Cornish testified that he had an oral contract with the Vinoy that he would pay a fee in return for the ability to dock his boat and receive club privileges, such as parking and use of the facilities, in a gated area. (Cornish Dep. at 125). He also testified that it was his understanding that the Vinoy would be responsible for securing his vessel "in my absence." (Cornish Dep. at 125).

To the extent that state law is not inconsistent with admiralty principles, "state contract law may be applicable to maritime contracts." *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 459 (5th Cir. 1995); *cf. Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 27-28 (2004) (noting that in certain instances, "[a] maritime contract's interpretation may so implicate local interests as to beckon interpretation by state law"). "[I]t is an established rule of ancient respectability that oral contracts are generally regarded as valid by maritime law." *Kossick v. United Fruit Co.*, 365 U.S. 731, 734-35 (1961). In order to sustain a case for breach of contract, Plaintiff must prove (1) the terms of a maritime contract; (2) that the contract was breached; and (3) the reasonable value of the purported damages. *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005) (setting forth elements for a repair contract). An oral contract requires "offer, acceptance, consideration and sufficient specification of essential terms." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004).

Defendants have not, in their motion, contested the existence of a valid oral contract, nor do the parties dispute the terms of the contract. Defendants instead argue that the contract was not

---

was actually attached broke, or that the breakage of the other portions contributed to a weakening of Slip 2. However, even Defendants' expert testified that the design of the marina contributed to the damage to the vessel. (Loporcaro Dep. at 70-71, 103).

applicable because Cornish and his representatives were present to secure his vessel. (Dkt. 28 at 14). Plaintiffs respond that "[t]his is clearly not the case and is adamantly disputed by the Plaintiffs." (Dkt. 48 at 14).

The Court finds that the term "in my absence" is ambiguous. *Strama v. Union Fidelity Life Ins. Co.*, 793 So. 2d 1129, 1132 (Fla. 1st DCA 2001) (the initial determination of whether a contract term is ambiguous is a question of law); *Arriaga v. Fla. Pac. Farms, Inc.*, 305 F.3d 1228, 1246-47 (11th Cir. 2002). "In my absence" could be interpreted to apply to Cornish's absence or the absence of his representatives. In addition, it is not clear whether Cornish (or his representatives) would be considered "absent" once they had made an appearance. "Where the terms of the written instrument are disputed and reasonably susceptible to more than one construction, an issue of fact is presented as to the parties' intent which cannot properly be resolved by summary judgment." *Strama*, 793 So. 2d at 1132; *see also* 11 *Williston on Contracts* § 30:8 (4th ed. 1993 & Supp. 2006) (noting that the same principles apply to oral contracts). Accordingly, Defendants' motion for summary judgment is denied as to Count II.

*Conclusion*

Based on the foregoing, it is **ORDERED AND ADJUDGED** that Defendants' Motion for Final Summary Judgment (Dkt. 28) is **DENIED**.

**DONE AND ORDERED** in chambers this 28th day of December, 2007.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record